April 15, 1999

NO. 4-98-0500

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from 

Plaintiff-Appellee, ) Cir­cuit Court of 

      v. ) Macon County     QUENTIN HOLLOMAN, ) No. 97CF1127

Defendant-Appellant. ) 

      ) Hon­orable

) James A. Hendrian,

) Judge Presid­ing.

JUSTICE STEIGMANN delivered the opinion of the court: 

In February 1998, a jury convicted defendant, Quentin Holloman, of possession of more than 30 grams but not more than 500 grams of canna­bis with in­tent to deliver (720 ILCS 550/5(d) (West 1996)).  The trial court later sentenced him to 10 years in pris­on and imposed a fine.  De­fen­dant ap­peals, claim­ing that (1) the court abused its dis­cre­tion by ad­mitting his prior felony convic­tion for im­peach­ment pur­pos­es; (2) the court commit­ted revers­ible error when it ad­mitted ex­pert tes­ti­mony consisting of "drug deal­er profiles"; (3) the court relied on erro­neous in­for­

ma­tion at sen­tenc­ing; and (4) he received inef­fec­tive as­sis­tance of his trial coun­sel.  We af­firm defendant's con­vic­tion but re­

mand for a new sen­tenc­ing hear­ing. 

   I.  BACKGROUND

Around 4 p.m. on Au­gust 23, 1997, Decatur police offi­cer Frank Hubbard and two other offi­cers went to 721 E. Johns Street in Decatur, Illi­nois, to con­duct a follow-up investigation of a shooting inci­dent.  Hubbard and Officer Platzbecker went to the front door of the residence while Officer Michael Gannon went to the rear.  When Hubbard knocked on the front door, it opened approximate­ly 12 inches, and a young man, Antonio Har­ris, came to the door.  Accord­ing to Hubbard's testimony, when he began the inter­view, Harris acted "ner­vous" and repeated­ly looked over his shoul­der toward the inside of the house.  After a few moments, Hubbard heard a com­mo­tion in­side the house, and Gannon re­port­ed over his ra­dio that per­sons were at­tempt­ing to exit the resi­dence through a rear window.  At that point, Har­ris at­tempted to close the front door on Hubbard and Platzbecker.  Hubbard, be­lieving a felo­ny was in prog­ress, pulled Har­ris onto the front porch and en­tered the resi­dence.    

In­side, Hubbard found defen­dant lying on the floor in the back bed­room.  Jimmy Brown was halfway out the window of the same room.  Hubbard also found a large quan­ti­ty of can­na­bis on and around a card table in the din­ing area.  Following a stan­dard procedure, Hubbard con­tact­ed Task Force X (the Decatur po­lice drug task force) upon dis­cov­ery of the drugs.  He then took the occu­pants of the resi­dence into cus­to­dy and se­cured the resi­

dence.  Task Force X ob­tained a war­rant, searched the premis­es, and col­lected the evi­dence.  Task Force officer Edward Root tes­tified that the total amount of can­nabis re­cov­ered at the house was 406.1 grams.  Root also recov­ered a box of plastic bags and a pair of scissors.  Sixty dollars in cash was found on the card ta­ble, and defen­dant was hold­ing $347 in cash at the time of his ar­rest.  Jimmy Brown was holding $350.  Defendant's fin­ger­prints were found on one of the plastic bags containing canna­bis.

Officer Carl Carpen­ter testi­fied that he inter­viewed de­fen­dant at the Macon County jail fol­lowing his arrest.  De­fen­

dant told Carpen­ter that he came to Decatur from Chi­cago with his cous­in, Jimmy Brown, to sell drugs out of the Johns Street house.  This arrangement was made at the re­quest of a Chicago man known as "Tray," who trans­port­ed de­fen­dant and Brown to Decatur and dropped them off at the Johns Street house.  An individual un­

known to defendant dropped off the drugs (about one-half pound of can­na­bis) and other sup­plies later that night.  At tri­al, de­fen­

dant de­nied hav­ing told Car­penter this ver­sion of events.

Defendant tes­ti­fied that he came to Decatur from Chi­ca­

go with Brown for a vaca­tion.  He ini­tially stayed at a mo­tel, but checked out after an altercation with the management over a $10 raise in the rates.  At some point prior to the events sur­

rounding his arrest at the Johns Street house, defendant bought some "weed" at the house and subsequently was picked up by the police.  After posting bond he re­turned to the house and asked if he could sleep there for a cou­ple of hours because he had nowhere else to go.  The young man at the house agreed.  Defen­dant smoked a lit­tle, moved some things out of the way, and went to sleep on the floor in the back bed­room.  Accord­ing to defen­dant, he slept until he was awak­ened by Hubbard.  

Gannon tes­ti­fied that he saw de­fen­dant by the win­dow as Brown was at­tempt­ing to climb out.  By the time Gannon reached the window (where he handcuffed Brown), de­fen­dant had re­treated back into the house and out of Gannon's sight.   

When the State in rebuttal sought to impeach defen-

dant's tes­timo­ny with a 1996 felony conviction for posses­sion of a con­trolled substance with intent to deliver, the trial court con­ducted a side-bar con­fer­ence out of the jury's pres­ence.  (The re­cord con­tains no tran­script or bystander's re­port of the side-

bar.)  After the side-bar, the court ad­dressed the jury as fol­

lows:

"Ladies and gentlemen, the only evidence in, uh, rebuttal by the State is a certified copy of conviction, uh, of a case in Macon County.  It is entitled The People of the State of Illinois vs. Quentin Holloman, [No.] 96-CF-

681, and the record indicates that on August the 16th of 1996, Quentin Holloman was con­

victed of a felony in Macon County.  

You can use that evidence in determining his credibility only.  It is not to be used for any other purpose."

Later, also out of the jury's presence, the trial court gave defendant an opportunity to state on the record his objec­

tion to the conviction's ad­mission.  Defen­dant as­sert­ed that its prejudicial effect out­weighed any proba­tive val­ue.  The court stated in re­sponse that it had over­ruled the ob­jec­tion and had weighed the prej­u­di­cial ef­fect against the proba­tive value when the court made its de­termi­nation and that, because the prior con­

vic­tion was for the same of­fense as current­ly charged, the "mere fact" ap­proach was used.  The court later clarified its ruling for fear that it orig­inally mis­stated the stan­dard.  The court stated as follows:

"[J]ust to make sure that so there is no prob­lem in the record, uh, that the probative value of the impeachment evidence was--I made that determination that it was not out­weighed by the undue prejudice that could be caused to the defendant.  I think I might have said it backwards."

The jury then convicted defendant and the trial court subsequently sen­tenced him as previously stat­ed.  This ap­peal fol­lowed.

II.  ANALYSIS

A.  Impeachment Evidence

Defendant first argues that the trial court abused its dis­cre­tion when it admitted his prior felony conviction for im­

peach­ment pur­pos­es.  Specifically, he alleges that the court sup­

planted the bal­anc­ing test re­quired under 
People v. Mont­gom­ery
, 47 Ill. 2d 510, 268 N.E.2d 695 (1971), with the "mere fact" meth­

od of im­peach­ment, thereby depriving him of the benefit of a mean­ingful 
Montgomery
 analysis.  

A trial court's decision to allow impeachment by a prior conviction should not be reversed absent an abuse of dis­

cretion.  
People v. McKibbins
, 96 Ill. 2d 176, 187-88, 449 N.E.2d 821, 826 (1983).  Under 
Mont­gom­ery
, a prior con­vic­tion is ad­mis­

si­ble to im­peach a testi­fying defen­dant if (1) the con­vic­tion was for a crime pun­ishable by death or imprison­ment for more than one year (a felo­ny); or (2) the con­viction was for a crime in­volving dis­hon­esty or false statement.  In either case, the prior con­vic­

tion is not admissible if (a) it is more than 10 years old, or (b) the pro­ba­tive value of the evi­dence is sub­stan­tially out­

weighed by the danger of unfair prej­u­dice.  
Mont­gomery
, 47 Ill. 2d at 516, 268 N.E.2d at 698; see also 
People v. Wil­liams
, 173 Ill. 2d 48, 83, 670 N.E.2d 638, 655 (1996) (
as­serting con­tinued ad­her­ence to the 
Mont­gom­ery
 standard).  

The "mere fact" method of impeachment was first sug­

gest­ed in 
Peo­ple v. Kunze
, 193 Ill. App. 3d 708, 731, 550 N.E.2d 284, 299 (1990) (Steigmann, J., specially concurring).  Under this method, only the existence of the prior con­vic­tion is re­

vealed to the jury, not its underlying nature.  Use of the "mere fact" method re­duces the risk of prejudice to the defendant, espe­cial­ly when the prior convic­tion was for the same or a simi­

lar of­fense as the current charge. 

In 
People v. Atkinson
, 288 Ill. App. 3d 102, 105-07, 679 N.E.2d 1266, 1268-69 (1997), this court clarified the way in which trial courts should con­duct the 
Mont­gom­ery
 analysis in conjunc­tion with the op­tion of using the "mere fact" method.  A trial court should first de­ter­mine if the prior con­vic­tion falls within the two categories of permissible con­vic­tions and meets the time­li­ness re­quire­ment.  If these two "me­chanical prongs" of the 
Mont­gomery
 test are sat­isfied, the court should then conduct the bal­ancing test.  
Atkinson
, 288 Ill. App. 3d at 106-07, 679 N.E.2d at 1269.  "In de­termining wheth­er the probative value of the evi­dence sought to be admitted is substan­tially outweighed by the danger of unfair prejudice, the court should consider eviden­

tiary alter­natives," one of which is the "mere fact" method of impeach­ment.  
Atkinson
, 288 Ill. App. 3d at 107, 679 N.E.2d at 1269. 

In this case, the trial court properly followed 
Atkinson
.  Defendant's prior con­vic­tion sat­is­fied the me­chan­i­cal prongs of 
Mont­gomery
--that is, it was a felo­ny con­vic­tion from 1996.  The record shows that the court weighed the proba­tive value of admitting the prior conviction against the possi­bility of unfair prejudice, and in doing so properly exercised its dis­

cre­tion.  The court stated that it per­formed the bal­anc­ing test and that be­cause the prior convic­tion was for the same of­fense as cur­rent­ly charged, the court opted to allow only the "mere fact" meth­od of im­peach­ment.  

In so concluding, we emphasize that a trial court's use of the "mere fact" method of impeachment by prior conviction does not mean that the court may refrain from engaging in the balanc­

ing test 
Mont­gomery
 requires.  Even though use of the "mere fact" meth­od will (in most cases) substantially 
reduce
 the preju­dicial effect a defendant might suffer by being impeached with a prior convic­tion--that is, as compared to the prejudice he might suffer by having the nature of the felony conviction re­vealed to the jury--use of the "mere fact" method does not 
elimi­nate
 that prej­

udicial effect. 

For example, consider a case in which a defendant on trial for armed robbery presents an alibi that he was at his aunt's birthday party at the time of the armed rob­bery.  Defen­

dant testifies to his presence at the birthday party, as do three other witnesses who claim to have been at the party with de­fen­

dant.  In rebuttal, if the State seeks to impeach the defen­dant by bringing forth his two prior burglary convic­tions, it would be entirely appropriate for the trial court to conclude that--even though it would use the "mere fact" method if it were to grant the State's request--on balance, the probative value of the defendant's prior convictions is substantially out­weighed by the danger of unfair prejudice he would suffer.  That is, because the defendant is but one of four alibi witnesses present­ed by the defense, the State does not really need to impeach his testimony by throwing doubt upon his credibility by means of his prior felo­ny convictions.  Thus, in this example, even though the use of the "mere fact" method would reduce the 
extent
 of the preju­

dice the defen­dant might suffer, the trial court may nonetheless de­termine that be­cause the pro­ba­tive value of the im­peaching evi­

dence is so slight, the minimal probative value is sub­stan­tial­ly out­weighed by the prejudicial effect.  In other words, cast­ing doubt upon the defendant's credibility does little to defeat the alibi defense because the defendant's testimony is corrobo­rated by three other witnesses, none of whom are impeached by the 
defendant's
 prior conviction.  

In this case, defendant essentially con­tends that a trial court presented with the State's request to impeach a de­

fendant with his prior conviction must utilize the 
Montgomery
 balancing test and decide to allow the impeachment by prior con­

viction 
before
 the court de­ter­mines wheth­er it will allow only the "mere fact" meth­od of impeach­ment.  In sup­port of this con­ten­tion, de­fen­dant cites a portion of the spe­cially con­curring opin­ion in 
Kunze
, which states that use of the "mere fact" meth­od is ap­pro­priate only after "the trial court has deter­mined that such evi­dence is ad­missible for that purpose under the 
Mont­gomery
 stan­dards."  
Kunze
, 193 Ill. App. 3d at 731, 550 N.E.2d at 299 (Steigmann, J., specially concurring).  However, defendant has misconstrued that specially concurring opinion, and his argu­ment is groundless.  

When a trial court assesses the admissibility of a defendant's prior conviction for impeachment purposes, 
Mont­gom­ery
 requires it to determine whether the probative value of the evi­

dence is substantially outweighed by the danger of unfair preju­

dice.  
Montgomery
, 47 Ill. 2d at 516, 268 N.E.2d at 698.  To properly apply this standard, the court must consider the evi­

dence that the jury 
will
 
actually
 
receive
.  The court's determi­

nation is not some academic exercise but instead a real-world balancing of proba­tive value versus unfair prejudice.  Trial courts routinely engage in such balancings in a mul­ti­tude of con­

texts (see 
People v. Lewis
, 165 Ill. 2d 305, 329, 651 N.E.2d 72, 83, (1995) ("even when evidence is relevant, it may, in the trial court's discretion, be excluded if its prejudicial effect sub­

stantially outweighs its probative value"); 
People v. Rodri­guez
, 291 Ill. App. 3d 55, 65, 684 N.E.2d 128, 134 (1997) (court may reject evidence due to its possibly unfair prejudicial nature)), and their doing so makes sense only when bal­anc­ing the actu­al evi­dence at issue.

Stripped of its rhetoric, defendant's proposed approach would re­quire trial courts in cases such as this one to de­ter­mine wheth­er the probative value of a defendant's prior con­vic­tion for the same drug offense is sub­stantially out­weighed by the danger of the unfair prejudice he would suffer, 
even
 
though
 
the
 
trial
 
court
 
has
 
no
 
inten­tion
 
of
 
ever
 
letting
 
the
 
jury
 
learn
 
that
 
defendant's
 
prior
 
con­viction
 
was
 
for
 
the
 
same
 
offense
.  However, including in this evidentiary balancing pro­cess a fact which will never be admitted makes no sense.  Thus, we re­ject defendant's argument.  

In per­form­ing the bal­anc­ing test, the trial court must con­sid­er the evi­dence that will actu­ally be pre­sent­ed to, and con­sid­ered by, the jury.  Therefore, if "mere fact" im­peach­ment will be used, that is what the court must con­sider.  That is what the court did here and, in so doing, it properly exercised its dis­cre­tion.

B.  Expert Testimony Defendant next argues that the trial court com­mit­ted re­versible error when it admitted expert testimony about "drug deal­er profiles."  Specifically, defendant claims that the tes­ti­mo­ny of Offi­cer Root on how cannabis is trans­ported into Macon Coun­ty, what form it comes in, and the typical char­ac­teris­tics of a "drug house" had slight bear­ing, if any, on his guilt or inno­cence on a charge of pos­ses­sion with in­tent to de­liver. 

Defendant failed to properly preserve this issue for review by failing to raise it in his posttrial motion.  
Peo­ple v. Cloutier
, 156 Ill. 2d 483, 507, 622 N.E.2d 774, 786 (1993).  Thus, defendant has forfeited this issue on appeal un­less the plain error rule applies, which occurs when the evi­dence is closely bal­anced or the error is of such mag­ni­tude the defen­dant has been denied a fair trial.  
Cloutier
, 156 Ill. 2d at 507, 622 N.E.2d at 786.  We conclude that the error al­leged here does not rise to the level of plain error, which re­quires that the as­sert­

ed error affect "some­thing 'funda­mental to the in­teg­ri­ty of the judi­cial process.'"  
People v. Keene
, 169 Ill. 2d 1, 17, 660 N.E.2d 901, 910 (1995), quoting 
People v. Green
, 74 Ill. 2d 444, 456, 386 N.E.2d 272, 278 (1979) (Ryan, J., specially concurring).

Root's testimony was elicited to prove that de­fen­dant had in­tent to de­liv­er, an element of the charged of­fense.  While some of Root's testimony may have been irrelevant, none of it was so prejudicial that its admission amounts to plain error.  The evi­dence in this case was not close­ly bal­anced, and the admission of the evidence in question did not deny defendant fun­da­mental fair­ness.

Although we have concluded that defendant has forfeited on appeal the issue of expert testimony regarding "drug-deal­er pro­files," we nonetheless caution trial courts that such evi­dence must be seriously scrutinized and handled with care.  In a prop­er case, expert testimony by a police officer about how con­trolled substances are manufactured or packaged might be "high­ly rele­

vant," par­tic­u­larly if an issue in the case is whether the de­

fendant pos­sessed the controlled substances in question merely for his per­sonal use, as opposed to his posses­sion with an intent to deliver.  See 
People v. Moore
, 294 Ill. App. 3d 410, 418, 689 N.E.2d 1181, 1186 (1998).  However, in its po­ten­tially prejudi­

cial effect, this evi­dence is similar to expert tes­timony by a police officer about how street gangs operate.  As the supreme court has noted, because a "strong prejudice" may exist against street gangs, evidence indicating that a defendant was a gang member or in­volved in gang-related activity may be admissible only "where there is sufficient proof that membership or [gang] activ­ity is related to the crime charged."  
People v. Patterson
, 154 Ill. 2d 414, 458, 610 N.E.2d 16, 36 (1992). 

C.  Sentencing

Defendant next argues that he is entitled to a new sen­

tencing hearing because the trial court considered errone­ous information contained in the presentence report.  The presen­tence report list­ed defendant's 1996 con­vic­tion for possession with in­

tent to deliver as "cont. sub. traf­fick­ing."  However, defendant has never been convicted of controlled substance trafficking.  Nonetheless, in apparent reliance upon the presentence report, the court re­ferred to this con­vic­tion at de­fen­dant's sen­tenc­ing hear­ing when it stated the following:

"[T]here are three prior felony convictions, two of them are drug charges.  
The
 
last
 
was
 
a
 
controlled
 
substance
 
trafficking
 
charge
 [for] which he received three years [in prison], and I as­sume that he just got off parole when this was committed because it shows that he was not on parole at the time.  

I happen to agree with [the prosecutor] that if we are ever going to rid drugs out of this com­munity or any other community we are going to take the dealers off the street for as long as I possibly can to keep the indi­

vidual himself from dealing and to hopefully send a message that drug dealers are going to go away for as long as they can go away in this community.  Quite frank­ly, [defendant], if you want to sell drugs, do it up in Cook County but don't do it here." (Emphasis add­

ed.)

The State argues that the misrepresentation in the pre­

sen­tence re­port was immaterial because the trial judge's pri­mar­y point was that defendant was a deal­e­r, and not just a user, of ille­gal drugs and that had his prior conviction been accu­rately list­ed, the court would have reached the same conclusion.  Al­

though the State would have us spec­u­late that this is so, we 
know
 the court noted defen­dant's three pri­or convictions and spe­cif­

ical­ly ref­erred to the erroneous "traf­ficking" con­viction.  In light of this re­cord, we can­not con­clude that the trial court's consid­er­ation of the traf­ficking con­vic­tion was insignif­i­cant.  Because we agree with de­fen­dant that he is enti­tled to a new sentencing hearing with an accu­rate re­cord, we vacate his sen­

tence and re­mand for a new sentencing hearing.  

D.  Ineffective Assistance of Counsel

Last, defendant argues that ineffective as­sis­tance of coun­sel deprived him of a fair trial.  Inef­fec­tive as­sis­tance of coun­sel claims are re­viewed under the standard set forth in 
Strickland v. Wash­ing­ton
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).  Reversal under 
Strickland
 re­quires de­fen­dant to prove that (1) the con­duct of trial coun­sel fell below an objec­

tive standard of reason­able­ness (
Strickland
, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064); and (2) the defi­cient per­

for­mance prej­u­diced the de­fen­dant such that a "rea­son­able proba­

bili­ty" exists that the result would have been dif­fer­ent but for the deficient performance (
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068).  If it is easi­er to dis­pose of a claim for lack of suffi­cient prejudice accru­ing to defen­dant, that course should be taken.  
Strickland
, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

Defendant's primary contention is that his attorney was inef­fec­tive because he failed to move to sup­press the evi­dence aris­ing from defendant's arrest.  Defendant main­tains that such a mo­tion was his best "and possibly only" de­fense, and that such a motion would have been "pa­tent­ly meritori­ous" because his fourth amend­ment rights were vio­lated by the war­rantless search and arrest.  The State con­tends that defendant lacks standing under the fourth amend­ment and disputes whether defendant's fourth amendment claim is truly "mer­i­to­ri­ous,­" not­ing that be­cause defendant's ar­rest was not chal­lenged at trial, the State had no need or oppor­tunity to pre­sent evi­dence on the pro­pri­ety of the police officers' con­duct.  

In 
Kunze
, 193 Ill. App. 3d at 726, 550 N.E.2d at 296, this court held that adjudication of a claim of inef­fec­tive as­

sis­tance of counsel is often better made in pro­ceedings on a petition for postconviction relief, where a com­plete re­cord can be made.  In 
Kunze
, the ineffective assis­tance of counsel claim turned on whether the defendant would have tes­ti­fied had he known in ad­vance that the State would use his prior con­victions to im­

peach him.  
Kunze
, 193 Ill. App. 3d at 725, 550 N.E.2d at 296.  Because nothing in the record permitted such a deter­mi­na­tion to be made, this court declined to adjudi­cate defen­dant's claim.  
Kunze
, 193 Ill. App. 3d at 726, 550 N.E.2d at 296.  

Like­wise, in this case, wheth­er de­fen­dant suf­fered prej­u­dice for counsel's failure to make the sug­gested mo­tions depends on the likelihood of their success.  As the State points out, the record is devoid of factual findings on the is­sues per­

tinent to defendant's claim.  The record contains noth­ing to review with respect to either the ap­pro­pri­ateness of the officer's ac­tions or defendant's standing to raise fourth amend­

ment is­sues.  We there­fore de­cline the oppor­tunity to consider these questions.  Rather, de­fen­dant may pur­sue his claim un­der the Post-Conviction Hearing Act (725 ILCS 5/122-1 
et
 
seq
. (West 1996)).  
People v. Flores
, 231 Ill. App. 3d 813, 827-28, 596 N.E.2d 1204, 1213-14 (1992) (held, without an explana­tion from trial coun­sel, review­ing court cannot determine whether trial counsel's omis­sions involved the exercise of judgment, discre­

tion, or trial tactics, which are not review­able matters; recom­

mended postconviction petition as a bet­ter forum for adjudi­ca­tion of inef­fec­tive assis­tance claim); 
Peo­ple v. Palacio
, 240 Ill. App. 3d 1078, 1087, 607 N.E.2d 1375, 1380 (1993) (held, "[t]he ap­pel­late court is not the ap­propriate forum to de­cide contested ques­tions of fact," and defen­dant could pursue his claim pursuant to the Post-Con­vic­tion Hear­ing Act, under which the court could hear evi­dence and make ap­propriate findings); 
In re Carmody
, 274 Ill. App. 3d 46, 56, 653 N.E.2d 977, 984 (1995) (noting that the re­cord on di­rect appeal of a crimi­nal case rarely contains any explana­tion of the tactics of trial counsel, and holding that if those tac­tics are to be the subject of scru­tiny, a record should be devel­oped in which they can effec­tively be re­viewed); 
Kunze
, 193 Ill. App. 3d at 725-26, 550 N.E.2d at 296 
("[w]here *** con­

sid­er­ation of mat­ters out­side of the re­cord is re­quired in order to adjudi­cate the issues pre­sent­ed for re­view, the defendant's con­tentions are more appro­priately ad­dressed in pro­ceedings on a petition for post-con­vic­tion re­lief").

Defendant also claims that trial counsel was ineffec­

tive for fail­ing to move to dismiss count II, possession with a prior posses­sion conviction.  720 ILCS 550/4(d) (West 1996).  Because count II was va­cated at sen­tenc­ing, defendant cannot make the necessary showing of prejudice under 
Strickland
, 
i.e.
, that he was so prej­u­diced by counsel's omission that a different re­

sult was "reason­ably proba­ble."  See 
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.  Defendant could not have obtained a more favor­able re­sult.

In light of our decision to grant de­fen­dant a new sen­

tenc­ing hear­ing, we need not address defendant's argument regard­

ing his coun­sel's failure to cor­rect the error on the presen­tence re­port.  We similarly need not address his argument that he is enti­tled to a cred­it of $10 against the im­posed fines, repre­sent­ing $5 for each day he was incarcer­ated before being released on bond (725 ILCS 5/110-14 (West 1996)), even though the State con­

cedes that defendant is enti­tled to a cred­it of $10 against ei­

ther the street-value fine or the drug-treat­ment as­sessment, but not both under 
People v. Sinnott
, 226 Ill. App. 3d 923, 936, 590 N.E.2d 502, 511 (1992).  

III.  CONCLUSION

For the rea­sons stated, we affirm defendant's con­vic­

tion and remand for resentencing.

Affirmed in part and vacated in part; cause remanded.

GARMAN and MYERSCOUGH, JJ., concur.